U.S DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

JUN - 1 2012

TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| JONES ENERGY CO., LLC | CIVIL ACTION NO: 09-1425 |
| VERSUS | JUDGE DONALD E. WALTER |
| CHESAPEAKE LOUISIANA, L.P.<br>CHESAPEAKE OPERATING, INC. | MAGISTRATE JUDGE HORNSBY |

| | |
|---|---|
| JONES ENERGY CO., LLC | CIVIL ACTION NO: 10-1499 |
| VERSUS | JUDGE DONALD E. WALTER |
| CHESAPEAKE LOUISIANA, L.P.<br>CHESAPEAKE OPERATING, INC. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

This matter came before the Court for a bench trial December 12 through 14, 2011, as a consolidated action.[1] The original suit, 5:09-cv-1425 ("*Jones I*"), was filed in state court on July 22, 2009, by Jones Energy Co., ("Jones Energy") as a declaratory judgment action regarding four wells.[2] Chesapeake Operating, Inc., and Chesapeake Louisiana, L.P. (herein collectively "Chesapeake") removed the action to federal court. *Jones I* sought a declaration from the Court that Jones Energy was entitled to the status of an "owner not notified" under Louisiana Revised Statute 30:10 (the "Risk Fee statute" or "30:10"), because Jones Energy allegedly did not receive proper notification by Chesapeake of its intent to drill under 30:10. *Jones I* also sought an injunction from the Court

---

[1] On October 15, 2010, pursuant to Federal Rule of Civil Procedure 42(a), the Court consolidated *Jones I* and *Jones II* because the cases involve common questions of law and fact.

[2] Carmichael 29 H-1 Well, Clingman Acres 11-H-1 Well, Anthony Forest Products 28-1 Well, and Western D H-1 Well.

to require Chesapeake to: (a) produce all information required under 30:10, (b) provide gas marketing letters and division orders for the four wells in question, and (c) pay and distribute all royalties due to Jones Energy based on its share of gas production attributable to the four wells in question in accordance with 30:10.

The second suit, 5:10-cv-1499 ("*Jones II*"), was filed by Jones Energy in state court on September 7, 2010, and was subsequently removed by Chesapeake. Like the first lawsuit, *Jones II* was filed as a declaratory judgment action and petition for injunctive relief. *Jones II* sought a declaration from the Court that Chesapeake failed to provide the statutorily required information under 30:10 in its notice letters, thus rendering Jones Energy an "owner not notified" as to the wells described in *Jones I* and six additional wells.[3] *Jones II* also sought a declaration from the Court that the letters of intent to drill sent by Chesapeake to Jones Energy contained false, misleading, and deceptive information in violation of the Louisiana Unfair Trade Practices Act, La. R.S. § 51:1405. *Jones II* also sought a declaration that Chesapeake engaged in fraudulent and deceptive trade practices for allegedly failing to provide Jones Energy with the actual costs associated with each well, and then filing liens against Jones Energy for failure to pay the associated costs. Further, *Jones II* sought a declaration that the liens in question were improperly and fraudulently filed because the amount reflected in each lien included the 200% risk-fee penalty available under 30:10. Finally, *Jones II* requested that the Court declare that Chesapeake engaged in an unfair and deceptive trade practice in violation of La. R.S. § 51:1405 by attempting to purchase Jones Energy's interests in the wells below market value, and (after Jones Energy refused to sell) filing fraudulent liens to frustrate

---

[3] Muslow 5-15-15 H-1 Well, Red Oak Properties 33-15-16 H-1 Well, Posey 5 H-1 Well, Taylor Potter 8-16-14 H-1 Well, Indigo 30-15-16 H-1 Well, and Bryan 3-15-16 H-1 Well.

Jones Energy's attempt to sell its interests to one of Chesapeake's competitors. Jones Energy also sought damages for Chesapeake's alleged fraudulent, deceptive, and unfair actions. [4] [5]

*Jones II* also sought an injunction from the Court ordering Chesapeake to: (a) produce all information required under 30:10, (b) provide gas marketing letters and division orders for the ten wells in question, (c) provide an accounting for all costs and proceeds attributable to Jones Energy for its pro rata share, (d) pay and distribute all royalties due to Jones Energy based on its share of gas production attributable to the wells in question in accordance with 30:10, and (e) cancel each of the liens filed by Chesapeake on May 4, 2010, pertaining to the wells at issue in this case.

Chesapeake denied the allegations made by Jones Energy in both lawsuits, and maintained that it fully complied with the requirements of 30:10. Chesapeake responded that Jones Energy affirmatively elected to participate as a non-operator in each well, that Jones Energy received invoices for each well, and that Jones Energy failed to pay invoices within 60 days of receipt for each well. Chesapeake maintains that it took appropriate action in assessing the risk-fee charge under 30:10, withholding amounts owed by Jones Energy from production, and filing liens against the subject wells in the mortgage records. Chesapeake denies that it engaged in any conduct sufficient

---

[4] Jones Energy also contests certain charges included in Chesapeake's billings for costs associated with drilling, testing, and completing the wells in question. All disputes regarding the calculation of well costs are resolved by the Commissioner of Conservation after notice to the interested parties and a public hearing thereon. La. R.S. § 30:10(A)(2)(f). Accordingly, this issue will not be addressed by the Court.

[5] Jones Energy originally claimed that Chesapeake violated LUTPA by failing to promptly pay royalties from production. The issue of which party owes the obligation to pay royalties to the landowners is pending in the First Judicial District Court, Caddo Parish, Louisiana. *Larry D. Pierce, et al v. Jones Energy Company, LLC*, No: 555210-B. The parties agree that this question will be addressed in another forum. Therefore, this Court will not address the issue.

to give rise to a claim under the Louisiana Unfair Trade Practices Act.

Chesapeake asserted a counterclaim against Jones Energy for its failure to pay its pro rata share of actual reasonable expenditures incurred by Chesapeake for drilling, testing, completing, and operating the wells in question. Chesapeake also maintains that it properly assessed the additional risk-fee charge of 200% of Jones Energy's allocated share as allowed under 30:10 because Jones Energy failed to remit payment for more than 60 days after it received detailed invoices.

Chesapeake also alleged that it was entitled to recover the full amount owed by Jones Energy under Louisiana's Open Account Statute, La. R.S. § 9:2781, including an award for attorney's fees as provided for under the statute. Finally, Chesapeake alleged that it is entitled to the recognition and enforcement of its liens against Jones Energy under the Louisiana Oil Well Lien Act, La. R.S. § 9:4889.

In response, Jones Energy denies each of Chesapeake's claims and further answers that Chesapeake's remedy, if any, is found exclusively in 30:10.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  Risk-Fee Statute

This case involves 10 unit wells drilled by Chesapeake, as unit operator for each of those units, namely the Carmichael 29 H-1, Clingman Acres 11 H-1, Anthony Forrest Products 28-1, Western D 17-15-15 H-1, Muslow 5-15-25 H-1, Red Oak Properties 33-15-16 H-1, Posey 5 H-1, Taylor-Potter 8-16-14 H-1, Indigo 30-15-16 H-1, and Bryan 3-15-16 H-1. [Doc. #86 - Stipulated Facts].

Following public hearings, the State of Louisiana Office of Conservation issued orders that created the relevant units and required that the separately owned tracts, mineral leases, and other

properties within the units be force pooled and integrated with each separate tract sharing in unit production on a surface acreage basis of participation. *Id.* Chesapeake requested to be the unit operator of each of the subject wells, and was designated as such by the Commissioner of Conservation. *Id.*

Jones Energy does not have a sublease, assignment or Joint Operating Agreement with Chesapeake in connection with the subject wells within the unit area. *Id.* When a Joint Operating Agreement does not exist, the Louisiana Mineral Code, the Louisiana Conservation Code, and the "Risk Fee Statute" set forth the parties' obligations to each other. Jones Energy and Chesapeake agree that their obligations arise from La. R.S. § 30:10. The Risk-Fee statute provides in relevant part:

> Should a notified owner elect not to participate in the risk and expense of the unit well or should such owner elect to participate in the risk and expense of the unit well and then fail to pay his share of such expenses within sixty days of receipt of detailed invoices, the owner drilling same shall, in addition to any other available legal remedies to enforce collection of such expenses, be entitled to own and recover out of production from such unit well allocable to the tract belonging to the nonparticipating owner such tract's allocated share of the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the unit well, including a charge for supervision, together with a risk charge, which risk charge shall be two hundred percent of such tract's allocated share of the cost of drilling, testing, and completing the unit well.

La. R.S. § 30:10(A)(2)(b)(i).

The statute does not require owners to financially obligate themselves to the up-front costs associated with drilling in a compulsory unit. However, it does force a non-operating owner in a drilling unit to either choose to participate in the drilling costs or be subject to a 200% non-consent penalty. The risk-fee charge simultaneously rewards participating working interest owners and

discourages "free-riding by non-participating working interest owners." Blaise M. Sonnier, Accounting for Well Cost Adjustments in Louisiana, 55 Loy. L. Rev. 79, 89 (2009).

    1.    <u>Compliance with the La. R.S. § 30:10 notice requirement?</u>

For an operator to avail themselves of the benefits of the risk-fee statute it must first send notice of its proposed operations to the non-participating working interest owners in the unit. La. R.S. § 30:10(A)(2)(a)(i). The notice must provide the nonparticipating working interest owners the opportunity to elect to participate in the risk and expense of the proposed well. *Id.* The statute requires that the notice letter include:

    (aa)    An estimate of the cost of drilling, testing, completing, and equipping the unit well;

    (bb)    The proposed location of the unit well;

    (cc)    The proposed objective depth of the unit well; and

    (dd)    All logs, core analysis, production data, and well test data from the unit well which has not been made public.

*Id.*

At the conclusion of the trial and after hearing all of the witnesses and having reviewed all of the evidence, the Court ruled from the bench that as a matter of fact Chesapeake sent certified letters to Jones Energy of its intent to drill as to each of the subject wells and that each of the letters substantially complied with the requirements of 30:10(A)(2)(a)(i).

This Court was presented with what appears to be a matter of first impression: whether an operator's notice under 30:10(A)(2)(a)(i) is vitiated if the operator failed to include information or

6

provided inaccurate information as to one of the enumerated categories.[6] This question was crucially important given that the Court also found as a matter of fact that Jones Energy affirmatively elected to participate in the drilling of each of the ten wells, received invoices for its pro rata share of expenses for each of the ten wells, yet failed to pay within 60 days of receipt as required under the statute. This course of events is sufficient to allow Chesapeake to collect the 200% risk-fee.[7]

Jones Energy challenged the sufficiency of the original notice it received from Chesapeake based primarily on the alleged failure of Chesapeake to provide "all logs, core analysis, production

---

[6] The events at issue in the matter all occurred in Louisiana and the Court's subject matter jurisdiction is based on diversity of citizenship. Thus, Louisiana substantive law applies to the instant matter. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817 (1938). To determine Louisiana law, the Court must look to the final decision of the Louisiana Supreme Court. *In re Katrina Canal Breaches Lit.*, 495 F.3d 191, 206 (5th Cir. 2007). When there has not been a controlling decision issued by the state's highest court, as in the instant matter, this Court must make an *Erie* guess to determine as best it can what the highest state court would decide if it were presented with the same facts. *Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 264, 269 (5th Cir. 2009).

[7] The Court was also asked to determine whether Jones Energy, subsequent to its affirmative election to participate in the drilling of the wells, received detailed invoices from Chesapeake sufficient to require payment within sixty days of receipt under 30:10(A)(2)(b)(i). In seeking a declaratory judgment Jones Energy denied receiving detailed invoices from Chesapeake for the ten subject wells. The Court placed the burden on Chesapeake to prove by a preponderance of the evidence that it mailed invoices for each of the subject wells and that they were received by Jones Energy. The Court found that Chesapeake carried this burden by proving that numerous Joint Interest Billing Statements ("JIBS") were mailed for each well via regular post to Jones Energy at its corporate address and not a single JIB was ever returned to Chesapeake by the post office as undeliverable. The burden of rebutting this evidence rested with Jones Energy, and the Court found that Jones Energy failed to provide satisfactory rebuttal.

Having found as a matter of fact that Jones Energy elected to participate in the ten subject wells and then failed to pay Chesapeake within sixty days of receipt of detailed invoices (JIBS) as to the ten subject wells, the Court also found as a matter of law that Chesapeake may assess the risk-fee charge of two hundred percent of Jones Energy's allocated share of the cost of drilling, testing, and completing the subject wells.

7

data, and well test data from the unit well which has not been made public". La. R.S. § 30:10(A)(2)(a)(i)(dd). Jones Energy argued that if the notices sent by Chesapeake were insufficient under the statute then Jones Energy should be considered an "owner not notified" despite its affirmative election to participate and subsequent failure to pay its proportionate share.

Being declared an "owner not notified" by the Court would have allowed Jones Energy to be responsible for only its allocated share of the actual reasonable expenditures incurred in the drilling, testing, completing, equipping, and operating the well. La. R.S. § 30:10(A)(2)(b)(ii). More importantly to Jones Energy, if found to be an "owner not notified" Chesapeake would be unable to recover the additional 200% risk-fee charge as allowed by the statute when a notified owner chooses either not to participate, or elects to participate but then fails to pay its share of expenses within 60 days of receiving a detailed invoice from the Operator. La. R.S. § 30:10(A)(2)(b)(i). Under this scenario Jones Energy would be able to recover its proportionate share from production without ever incurring the actual risk of owing expenses on a dry hole well after affirmatively electing to participate, and without paying the 200% risk-fee charge that Chesapeake would otherwise be able to collect under the statute.

Based on the facts specific to this case, the Court ruled from the bench at the conclusion of trial that Chesapeake substantially complied with the notice requirements of 30:10 because Jones Energy received most, if not all, of the information required under the statute. The risk-fee statute is to be liberally construed in favor of the owner operator because it is the owner and operator who initially shoulders the expense and risk of drilling the unit well. The statute is not intended to allow an owner to elect to participate and then sit aside to discern whether a well is producing or not, and if so, attack the operator's notice with the hope that a Court will construe the statute so strictly that they will be deemed an "owner not notified". Such a holding would allow an owner to reap all of

the lucrative benefits of drilling without any of the inherent risk of such a venture. In finding that Chesapeake's notice letters substantially complied with the language and spirit of 30:10, this Court noted that Jones Energy is a sophisticated owner who repeatedly elected to participate without seriously questioning the contents of the notice letters.[8] The equities in this case lie with Chesapeake.

2. <u>In rem or in persona?</u>

The final issue for the Court to consider with respect to 30:10 is whether Jones Energy is personally liable for the amount it owes to Chesapeake (inclusive of the 200% risk-fee) or whether Chesapeake is limited to recovering the amount *in rem* from production of the subject wells. Jones Energy and Chesapeake offer differing opinions on this issue, each citing to cases analyzing a previous version of 30:10 before the inclusion of 30:10(A)(2)(a) and (b), which provide the notice requirement, the option of a non-operator to elect to participate, and the ability of the operator to collect the risk-fee charge. *See Davis Oil Co. v. Steamboat Petroleum Corp.*, 583 So.2d 1139 (La. 1991); *Superior Oil Co. v. Humble Oil & Refining Co.*, 165 So.2d 905 (La. App. 4th Cir. 1964).

The previous version of 30:10 did not include the risk-fee charge for non-participating owners or participating owners who failed to tender timely payment. The language of the statute simply stated:

> In the event pooling is required, the cost of development and operation of the pooled unit chargeable by the operator to the other interested owners shall be limited to the actual reasonable expenditures required for that purpose, including a charge for supervision. In the event of a dispute relative to these costs, the commissioner shall determine the proper costs, after notice to all interested persons and a hearing.

La. R.S. 30:10(A)(1)(c) (effective until Jan. 1, 1985). The plain language of the statute does not

---

[8] Jones Energy asked for additional information on two of the wells after electing to participate, but never followed up with Chesapeake regarding such requests.

specify the manner in which costs are to be determined as chargeable or non-chargeable to non-operators in the unit.

Faced with the language of the statute as it existed in 1964, the Court in *Superior Oil Co. v. Humble Oil & Refining Co.*, 165 So.2d 905 (La. App. 4th Cir. 1964) held that a non-operating owner who <u>initiated unitization</u> over land that encompassed a pre-existing well could be held personally responsible for its proportionate share of the costs to drill and complete the well. In reaching this conclusion the Court noted that if the operator were limited to *in rem* recovery out of production for the non-operator's proportionate share the operator would in essence be financing the non-operator's participation until reimbursement could be obtained from production. *Id.* at 908. To allow such a result would require the operator to make the entire initial investment, with the return only partly accruing to the operator while other portions were accruing to the non-operator. *Id.* The Court held that given the facts of the case (where non-operator forced unitization over a producing well) it would be profoundly unfair to the operator to not hold the non-operator personally liable for its share of the expenses. *Id.*

The Court in *Davis Oil Co. v. Steamboat Petroleum Corp.*, 583 So.2d 1139 (La. 1991), reached a different conclusion regarding personal liability under the pre-1985 version of the statute when presented with distinctive facts. *Davis* presented the question of whether an owner within a compulsory drilling unit should be held personally liable for its proportionate share of the drilling expenses when it did not consent either expressly or implicitly to participate in the drilling operations. An important fact in *Davis* is that the two unit-wells drilled by the operator were ultimately dry holes. *Id.* at 1141. The Louisiana Supreme Court noted the lack of specificity in the pre-1985 conservation statute, and ruled in equity that a non-operating owner who does not consent to operations within the unit has no liability for the costs of operations except out of his share of

production. *Id.* at 1143. In reaching this conclusion the Court noted that in the absence of implicit or express consent to hold a non-operating party personally liable for its proportionate share of the unit costs in an unsuccessful venture would present a situation where the more fortunate party could yield a considerable amount of power over the less opulent party, which could result in financial ruin or forced divesting of property rights of the latter to the former. *Id.* at 1144; citing *Freeman v. Depression Oil Co.*, 159 So. 192 (La. App. 2d Cir. 1935).

The addition of the risk-fee language to 30:10 by the legislature in 1984 provides a balance to the competing equities between the operator and a non-operator within a drilling unit. Once again, the relevant language provides:

> Should a notified owner elect not to participate in the risk and expense of the unit well or should such owner elect to participate in the risk and expense of the unit well and then fail to pay his share of such expenses within sixty days of receipt of detailed invoices, the owner drilling same shall, in addition to any other available legal remedies to enforce collection of such expenses, be entitled to own and recover out of production from such unit well allocable to the tract belonging to the nonparticipating owner such tract's allocated share of the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the unit well, including a charge for supervision, together with a risk charge, which risk charge shall be two hundred percent of such tract's allocated share of the cost of drilling, testing, and completing the unit well.

La. R.S. § 30:10(A)(2)(b)(i). This provision resolves the issue noted in *Superior*, that an operator should not be required to provide free financing for non-operators, by allowing the operator to recoup the risk-fee charge of 200% from both non-consenting owners as well as participating owners who fail to timely pay their proportionate share of expenses. Thus, the operator is made whole above and beyond any amount expended to finance the collection of the non-participating owners pro-rata share of production. Similarly, the provision resolves the issue noted in *Davis*, that a non-consenting owner is often less fortunate and less powerful than the operator and therefore, should not be subject

to personal liability for drilling expenses. As both *Davis* and the revised statute make clear, a non-consenting owner's proportionate share may only be collected from production in addition to the 200% risk-fee charge.

This case presents a second question of first impression under the current version of the statute: whether a consenting/participating owner may be held personally liable for its share of the drilling expenses and the risk-fee charge for nonpayment under the statute, or whether the total amount owed must be recovered from production. Upon review of the statute, this Court concludes that the plain language of the statute makes no distinction between an owner that elects not participate and one that elects to participate and then fails to pay its share of expenses. In either instance the statute provides the same remedy: 'the owner drilling the well shall, in addition to any other available remedies to enforce collection of such expenses, be entitled to own and recover out of production" the nonparticipating owner's share of reasonable expenditures plus an additional risk-fee charge of 200 percent. La. R.S. § 30:10(A)(2)(b)(i).

Chesapeake argues that the phrase "in addition to any other available remedies to enforce collection of such expenses" allows it to pursue all legal remedies, including a personal judgment against Jones Energy. To accept this interpretation of the statute the court must ignore the plain language of the statute that provides for recovery out of production. The court interprets the phrase "in addition to all available legal remedies to enforce collection of expenses" to include measures such as the filing of liens, but not a personal judgment.

The Court finds the case of *King v. Strohe*, 673 So.2d 1329 (La. App. 3d Cir. 1996), cited by Chesapeake, to be unpersuasive because the facts and statutory section of 30:10 are distinctive from this case. *King* involves the rights and obligations between an operator and unleased mineral

interest owners, who are provided greater protections under La. R.S. § 30:10(A)(3). This section allows an operator to market production from the unit without consent or a contractual relationship with the unleased interest owner. The trade-off for such an allowance is that an operator has an obligation to pay the pro-rata share of the proceeds from production. *King*, 673 So.2d at 1338. It is this obligation which is personal and heritable in nature. *Id.* at 1339. This holding is specific only to La. R.S. § 30:10(A)(3), and this Court declines to flip the running of the obligation to the unleased mineral owner or to extend the holding to relationships beyond what is recognized in 30:10(A)(3) the facts in this case.

Upon due consideration, the Court concludes that any collection of Jones Energy's pro-rata share and risk-fee charge must be taken *in rem* from production. Further, the collection *in rem* should be credited to each well from the proceeds of that specific well. The statute refers to the drilling unit well in the singular form, and the Court does not interpret the statute to allow production revenues from one unit well to pay for the costs associated with a separate unit well.

**B.    Louisiana Unfair Trade Practices Act**

Jones Energy alleged that Chesapeake violated the Louisiana Unfair Trade Practices Act ("LUTPA") by filing "fraudulent" liens against Jones Energy regarding the subject wells in an effort to prevent Jones Energy from selling certain leases to a competitor of Chesapeake for a fair price. At the conclusion of Jones Energy's case in chief this Court granted Chesapeake's Rule 52(c) motion, finding that as a matter of law Jones Energy failed to present sufficient evidence to establish that Chesapeake engaged in any unfair or deceptive act method, act, or practice in violation of La. R.S. § 51:1405(A).

LUTPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. La. R. S. § 51:1405(A). To recover damages a plaintiff must prove fraud, misrepresentation or other unethical conduct. *Computer Management Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 404 (5th Cir. 2000) (citation and internal quotation marks omitted). A trade practice is "unfair under the statute only when it offends established public policy and is immoral, unethical, oppressive or unscrupulous." *Cheramie Services, Inc. v. Shell Deepwater Production, Inc.*, 35 So.3d 1053, 1059 (La. 2010). The determination of what qualifies as "unfair trade practice" is largely left to the courts on a case by case basis. *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993) (citation omitted).

The range of prohibited practices under LUTPA is extremely narrow. The Louisiana Supreme Court has noted:

> LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions. The statute does not forbid a business from doing what everyone knows a business must do: make money. Businesses in Louisiana are still free to pursue profit, even at the expense of competitors, so long as the means used are not egregious.

*Cheramie Services*, 35 So.3d at 1060.

This Court has found that Chesapeake's notice letters to Jones Energy substantially complied with the statutory requirements of 30:10, and that a minor discrepancy, if any, is insufficient to vitiate the notice. Thus, Jones Energy's election to participate in the drilling of the subject wells under 30:10 created an obligation which Chesapeake had a right to enforce.

Jones Energy argued that Chesapeake's timing in filing the liens in question was sufficient to demonstrate an unfair trade practice because the liens interfered with the completion of a sale of

14

Jones Energy's mineral leases to a competitor of Chesapeake. The Court finds this argument unpersuasive. The Louisiana Oil Well Lien Act provides broad and far reaching protections for operators in conjunction with the drilling of wells. *See* La. R. S. § 9:4861 *et seq*; La. R.S. § 9:4882. An operator may assert a privilege over a well within a drilling unit to secure the payment of all obligations incurred for the costs that a non-operator is bound to pay. La. R.S. § 9:4882.

There is no question that after electing to participate in the drilling of the subject wells Jones Energy was obligated to pay, at a minimum, its pro-rata share of the expenses associated with the drilling of the subject wells. However, Jones Energy asks the Court to find the filing of the liens to be a violation of the LUTPA because they were filed immediately before the completion of a sale of certain leases owned by Jones Energy to a competitor of Chesapeake. The Court disagrees with this inference. LUTPA does not prohibit the exercise of sound business judgment, even at the expense of another entity. Chesapeake had a valid reason to file liens against the subject wells, and only took such action after Jones Energy repeatedly failed to remit payment to Chesapeake for its pro rata share of expenses after electing to participate in the drilling of the subject wells. Chesapeake's decision to file the liens was merely the result of prudent business judgment to protect its interests using a legally available avenue. This is far from egregious or unethical behavior necessary to establish a LUTPA violation even if the collateral effect was that Jones Energy's tentative deal with a competitor of Chesapeake was compromised.

Jones Energy also alleged that the liens contained misrepresentations because they improperly included the risk-fee charge in addition to the actual expenses. Again, the Court finds this argument unpersuasive. The purpose in allowing an operator to file a lien is to secure payment for an obligation of the non-operator and to provide notice of a claimed privilege to third parties.

As long as Chesapeake had a legitimate reason to file the liens in question, and believed it had the right to assert the amount claimed, the liens are valid. Any issues regarding the actual amount owed on the subject lien must be decided by the Commissioner of Conservation. La. R.S. § 30:10(A)(2)(f). If the Commissioner finds the amounts to be erroneous, Chesapeake must pay for the costs associated with correcting the mortgage records.

**C.** **Louisiana Open Accounts Statute**

Chesapeake makes a counterclaim for payment plus attorney's fees under the Louisiana Open Accounts Statute, La. R.S. § 9:2781. The Louisiana Open Accounts Statute is not applicable to the facts of this case for two reasons. First, the statute requires that the debt owed be for goods or services rendered, which is not the case between Jones Energy and Chesapeake. *Double-Eight Oil and Gas, LLC v. Caruthurs Producing Co., Inc.*, 942 So.2d 1279 (La. App. 2d Cir. 2006). Second, Jones Energy did not have an "open account" as contemplated by the statute because the amount owed was not incurred upon the extension of a line of credit by Chesapeake, but under an obligation arising from the language of La. R.S. § 30:10. *See Tyler v. Haynes*, 760 So.2d 559 (La. App. 3d Cir. 2000). Accordingly, Chesapeake's claim for attorney's fees under the Louisiana Open Accounts Statute is denied.

## CONCLUSION

Based on the foregoing, judgment is rendered in favor of Chesapeake. All of Jones Energy's claims are hereby **DISMISSED WITH PREJUDICE**. Chesapeake's counterclaims are granted to the extent of this ruling, that Jones Energy's pro-rata share of expenses and associated risk-fees may be collected *in rem* from the production of each of the subject unit wells. Chesapeake's claim for attorney's fees under the Louisiana Open Accounts statute is denied. As the prevailing party,

Chesapeake is entitled to costs.

**THUS DONE AND SIGNED**, this 30 day of May, 2012.

*/s/ Donald E. Walter*
DONALD E. WALTER
UNITED STATES DISTRICT JUDGE